# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CSX TRANSPORTATION, INC.**<br>**Plaintiff,**<br>v.<br>**B&J GROUP, INC.**<br>**Defendant.** | CIVIL ACTION NO. 17-5296 |

### MEMORANDUM OPINION

**Rufe, J.**  May 31, 2019

Plaintiff CSX Transportation Inc., an interstate rail common carrier, has sued Defendant B&J Group, Inc., which operates a warehouse at which it receives rail cars containing freight for storage by its clients. The parties have filed cross-motions for summary judgment on the issue of whether CSX has the authority to charge B&J Group demurrage fees associated with the storage of private railroad cars on railroad property.[1] B&J Group does not dispute the accuracy of the charges, only whether CSX can impose them. For the reasons explained below, the Court will grant CSX's motion and deny that of B&J Group.

## I. LEGAL STANDARD

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the

---

[1] Demurrage fees are "penalties assessed by railroads when shippers or recipients of freight do not timely return railcars to service after loading or unloading." *CSX Transp. Co. v. Novolog Bucks Cty.*, 502 F.3d 247, 250 (3d Cir. 2007). The charge of demurrage fees "both compensates rail carriers for the expenses incurred when rail cars are detained beyond a specified period of time (i.e., free time) for loading or unloading, and serves as a penalty for undue car detention to encourage the efficient use of rail cars in the rail network." 49 C.F.R. § 1333.1.

[2] Fed. R. Civ. P. 56(a).

suit under the governing [substantive] law."[3] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[5] Further, a court may not weigh the evidence or make credibility determinations.[6] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[7] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[8] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[9] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[10]

The rule is no different where there are cross-motions for summary judgment.[11] As stated by the Third Circuit, "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the

---

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4] *Id.*

[5] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[6] *Boyle v. Cty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[8] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[9] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[10] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[11] *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

losing party waives judicial consideration and determination whether genuine issues of material fact exist."[12]

## II. DISCUSSION

Interstate rail carriers "shall compute demurrage charges, and establish rules related to those charges."[13] The applicable federal regulations establish who may charge demurrage and who is subject to the charges. As to the former, "[d]emurrage shall be assessed by the serving rail carrier, i.e., the rail carrier providing rail cars to a shipper at an origin point or delivering them to a receiver at an end-point or intermediate destination."[14] For the latter, "[a]ny person receiving rail cars from a rail carrier for loading or unloading who detains the cars beyond the period of free time set forth in the governing demurrage tariff may be held liable for demurrage if the carrier has provided that person with actual notice of the demurrage tariff providing for such liability prior to the placement of the rail cars."[15] The carrier and its customers "may enter into contracts pertaining to demurrage, but in the absence of such contracts, demurrage will be governed by the demurrage tariff of the serving carrier."[16]

B&J Group operates within the Morrisville Yard, a private rail facility owned by U.S. Steel Corporation. After cars are delivered to the Morrisville Yard, Consolidated Rail Corporation ("Conrail") may move the cars to a nearby serving yard, Fairless Yard, to alleviate

---

[12] *Id.* (internal quotation omitted).

[13] 49 U.S.C. § 10746.

[14] 49 C.F.R. § 1333.2.

[15] *Id.* § 1333.3.

[16] *Id.* § 1333.2.

congestion at Morrisville Yard.[17] B&J Group contends that CSX has no authority to charge B&J demurrage fees because CSX itself does not own or lease the relevant railroad tracks, which are either owned by Conrail or owned by U.S. Steel and leased to Conrail. CSX maintains that it has obtained the right to assess demurrage on tracks owned or operated by Conrail. The Court agrees with CSX.

In 1998, the Surface Transportation Board approved the acquisition of Conrail by CSX and Norfolk Southern Railway Company ("Norfolk").[18] In pertinent part, the decision stated:

> Shared Assets Areas ["SAAs"] and Operating Agreements. Both [CSX and Norfolk] will be permitted to serve shipper facilities located within the three SAAs (the North Jersey SAA, the South Jersey/Philadelphia SAA, and the Detroit SAA), which will be owned, operated, and maintained by Conrail for the exclusive benefit of [CSX and Norfolk]. [CSX and Norfolk] will enter into an SAA Operating Agreement with [Conrail] in connection with each of the SAAs, and [Conrail] will grant to [CSX and Norfolk] the right to operate their respective trains, with their own crews and equipment and at their own expense, over any tracks included in the SAAs. [CSX and Norfolk] will each have exclusive and independent authority to establish all rates, charges, service terms, routes, and divisions, and to collect all freight revenues, relating to freight traffic transported for its account within the SAAs. Other carriers that previously had access to points within the SAAs will continue to have the same access as before.[19]

Once established, the SAAs were to be "used, enjoyed, and operated as fully by [CSX and Norfolk] as if each of them were Conrail."[20] The SAA Operating Agreement dated June 1, 1999, among Conrail, CSX, and Norfolk provides that "the Shared Assets shall be owned,

---

[17] Decl. of Jonathan Broder, Plff.'s Ex. S [Doc. No. 46-1] at ¶ 10.

[18] *CSX Corp. & CSX Transp., Inc.,* 3 S.T.B. 196, 1998 WL 456510 at *17 (1998).

[19] *Id.* at *14.

[20] *Id.* at *16.

operated and maintained by [Conrail] and used by or for the exclusive benefit" of CSX and Norfolk.[21] The decision further provided that:

> Switching Yard Services and other services performed by [Conrail] for either Operator under this Agreement shall be performed as agent for, and for the account of, such Operator. All freight traffic and Railcars handled within the Shared Assets Area, including traffic and Railcars handled by [CSX or Norfolk] . . . . and traffic and Railcars handled by [Conrail] [including Switching and Yard Services] shall at all times remain in the waybill, car hire and revenue accounts of either [CSX or Norfolk].[22]

Under the SAA Operating Agreement, Conrail has the responsibility to "control the dispatching, scheduling and movement of, and Switching and Yard Services for, all trains"[23] but "shall not participate or appear in any rates, routes or divisions relating to any freight traffic whatsoever to, from and within the [SAA], and shall not be entitled to or responsible for any freight charges relating to such freight traffic."[24] Conrail "shall not quote or establish any rate or service terms applicable to freight transportation services . . . enter into transportation contracts . . . or undertake to perform any for-hire transportation series directly."[25]

The Shared Assets are defined in relevant part as all tracks that Conrail "owns, leases or otherwise has the right to operate over" and uses for railway purposes in the SAA.[26] The upshot

---

[21] Shared Assets Area Operating Agreement for South Jersey/Philadelphia [Doc. 44] at 1.

[22] *Id.* at 13.

[23] *Id.* at 14.

[24] *Id.* at 13-14.

[25] *Id.* at 14.

[26] *Id.* at 6. The definition in full states:

"Shared Assets" means all tracks, lands, easements, rights of way, structures, facilities, appurtenances and rights related thereto, which CRC owns leases or otherwise has the right to operate over (including those segments over which CRC or an Operator possess operating rights pursuant to *Section 3(c)*), and which are used for railway purposes in the Shared Assets Area, including the properties, rights, equipment, inventory and supplies, whether owned or leased,

5

of these agreements is that in the area in question, CSX is the "serving rail carrier" required under the federal regulations to assess the charges.[27] Thus, if there is a contract between the parties or applicable tariffs of which B&J Group had notice, then B&J Group is responsible for paying the assessed charges.

There is no contract for demurrage between the parties here, but CSX has two relevant tariffs — a general one (CSX Tariff 8100), and a more specific one that applies to hazardous materials (CSX Tariff 4049).[28] The tariffs reference each other and must be considered together.[29] Tariff 4049 states that it applies to "CSX Transportation, Inc., and its rail subsidiaries and affiliates." As discussed above, Conrail is an agent, or affiliate, of CSX. Tariff 8100, as in effect at the relevant time, provided that fees "are applied to Private Cars waiting on a railroad's tracks; usually for leading, unloading or Shipment Instructions,"[30] and that it applied "to all transportation services provided by [CSX] and all railcars while on our network. If your shipment involves interline services, the rules, terms, and conditions of service published by each

---

described or referred to in Item 3A of Schedule [unclear] (including Attachments I and II) of the Transaction Agreement , but excluding Operator's Facilities.

*Id.* at 6-7. B&J Group argues that Section 3(c) does not include the tracks at issue here. But the reference to Section 3(c) is on emphasizing inclusion; it does not exclude other areas, and the Morrisville Yard and Fairless Yard are part of the Shared Assets. *See CSX Transp. Co. v. Novolog Bucks Cty.*, No. 04-4018, 2006 WL 1451280 at *4, 6 (E.D. Pa. May 24, 2006) (discussing CSX and demurrage charges associated with the Fairless Yard and the Morrisville Yard).

[27] *See Norfolk S. Ry. Co. v. Port Elizabeth Terminal & Warehouse Corp.*, No. 17-1819, 2019 WL 1399555, at *2 (D.N.J. Mar. 27, 2019) (rejecting a similar argument and holding that Conrail was acting as agent to NS).

[28] CSX contends, and B&J Group does not dispute, that all the shipments at issue in this case were classified as hazardous materials.

[29] CSX acknowledges that Tariff 8100 did not explicitly incorporate Tariff 4049 until January 1, 2015, and previously incorporated CSX's other rules generally. CSX seeks $3,900 that accrued before January 1, 2015. Pl.'s Reply Br. [Doc. No. 53] at 4 n.2.

[30] Pl.'s Ex. J [Doc. No. 41.12] at § 2.

other participating Carrier apply once your shipment enters its network."[31] Tariff 8100 also stated that the charges are accepted when a customer arranges for services with CSX.[32]

CSX has established that B&J Group received notices of the tariffs and the placement of the cars through access to the CSX website, ShipCSX, for which the Chief Operating Officer of B&J Group, Tilghman B. Frey, has an account.[33] CSX is identified on the bills of lading, and the charges were disclosed to B&J Group.[34] Therefore, CSX is entitled to summary judgment in the amount sought, $89,575, plus late fees and interest.[35] An appropriate order will be entered.

---

[31] Def.'s App. Publication CSXT 8100 [Doc. No. 45-2] at § 4. B&J Group argues that this language in Tariff 8100 does not apply to Conrail, because on January 1, 2019, after the events relevant to this litigation, CSX revised the tariff to provide that it applies "to all transportation services provided by [CSX] and all railcars while on our network and the tracks of Conrail while under a [CSX] waybill." Def.'s App. CSTX Changes [Doc. No. 45-2]. However, even if the amended language were interpreted to mean that Conrail was not previously included in Tariff 8100, Tariff 4049, with its language including CSX's affiliates, still applies to the shipments of B&J Group.

[32] Pl.'s Ex. J. [Doc. No. 41-12] at § 4.

[33] Pl.'s Ex. I, Dep. of Tilghman B. Frey [Doc. No. 41-11] at 7; Pl.'s Ex. A, Dep. of Joseph Fleischman [Doc. No. 41-3] at 46.

[34] Pl.'s Ex. I, Dep. of Tilghman B. Frey [Doc. No. 41-11] at 13.

[35] The calculations are summarized in Plaintiff's Statement of Material Facts and reference the tariffs and bills of lading. *See* Pl.'s Statement of Facts [Doc. No. 41-2].